



## MEMORANDUM OPINION

No. 04-09-00022-CR

Roderick **LIGHTEARD**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-4286B
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:        Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Steven C. Hilbig, Justice

Delivered and Filed: May 12, 2010

AFFIRMED

Roderick Lighteard was convicted of murder and sentenced to thirty years in prison. He

appeals the judgment, asserting the evidence is legally and factually insufficient to support the jury's

verdict and the trial court erred in failing to grant a mistrial after the prosecutor commented on

Lighteard's post-arrest silence. We affirm the trial court's judgment.

**BACKGROUND**

Lupe Cardenas was killed by a single gunshot while standing outside his home on February 6, 2007. Cardenas lived at the house with his fiancee, Marie Alvarado, and several of her children. One of Alvarado's daughters, Rosella Young, had dated a man named Reginald Adams for several years. Young testified she had broken up with Adams a few weeks before the shooting and begun dating Hugo Vargas, who lived across the street from her. However, the night before the shooting, Young spent the night with Adams. Young told the jury Vargas learned of this the next day and confronted her about it. Vargas then called Adams and challenged him to a fight.

A short time later, Adams drove up and stopped in front of Young's home. Vargas, Young, Alvarado, and several of Alvarado's children were standing outside the house. They saw Adams get out of the driver's side of the car and Lighteard exit from the passenger's side. According to Young and several other witnesses, Lighteard had a gun in his hand, pointed at the ground. Vargas was armed with a handgun that witnesses variously described either as a .25 or .380 caliber pistol. Young and Alvarado testified they tried to get Adams to leave. However, an argument ensued among Adams, Vargas, and Young's family. Another of Alvarado's children, Jeremy Trevino, came out of the residence with a shotgun. At some point, Cardenas, who had been visiting his parents, returned to the house. Upon learning Lighteard had a gun, Cardenas went inside the house and retrieved an SKS rifle. Cardenas was standing in the front yard with the rifle when the shooting began.

Young testified she was standing near Lighteard and facing him when she heard a loud noise behind her. She testified the sound could have been a gunshot. Young saw Lighteard duck, then stand up and fire his gun several times. Alvarado testified that when she saw Cardenas come out of

the house with the rifle, she told him to put it back in the house. She saw him turn towards the house and then she heard a sound. Then Alvarado was hit in the arm by a gunshot, then in her chest, and finally in her leg. Alvarado testified that when she was first hit, Cardenas told her to move and pushed her.

Trevino testified he was inside the residence when Adams and Lighteard arrived. He told the jury he heard arguing outside, and his younger brother came inside the house and told him of Adams's arrival. Trevino said he grabbed a shotgun and went outside. He testified he saw Lighteard with a gun and the two exchanged words about both having weapons. Trevino testified he then heard a loud noise that sounded like a gunshot, but could have also been caused by a door closing or car running over glass. When the noise happened, Trevino saw Lighteard duck behind Young and begin shooting. Trevino saw his mother shot and Cardenas move towards her. Trevino testified he next saw Cardenas struck in the head by a gunshot and saw Cardenas discharge his weapon into the ground. Adams and Lighteard got into the car and sped off. Trevino said he tried to shoot at the car using the shotgun, but it did not fire. He retrieved the SKS rifle from the ground next to Cardenas and shot at the vehicle as it drove away. One of his brothers used Vargas's gun to also shoot at the vehicle. Trevino recounted to the jury that on the morning of Trevino's testimony, Lighteard told him he had not meant to shoot Trevino's mother, but rather was trying to shoot the guy with the rifle next to her.

Dr. Elizabeth Peacock, a Bexar County Medical Examiner, testified she retrieved one bullet and two bullet fragments from Cardenas's body during the autopsy. Dale Justice, a forensic scientist with the Bexar County Crime Lab, identified the spent bullet as a .45 caliber. Justice also examined two spent bullets found embedded in the house, compared the bullets with the autopsy bullet, and

concluded that all three bullets were fired from the same weapon. Justice testified that based on the rifling characteristics of the spent bullets, the bullets were fired from a .45 caliber pistol probably manufactured by Hi-Point. Justice also examined six spent .45 caliber cartridges[1] and determined that all six cartridges were fired from the same weapon. The identifying marks on the cartridges were consistent with those made by a Hi-Point pistol. Justice identified a picture as being of a .45 caliber Hi-Point pistol from his office's firearm reference collection. Young testified the weapon in the picture looked like the pistol Lighteard used the night of the shooting.

Justice also identified Cardenas's rifle as a Noinco 7.62 x 39 mm caliber rifle. He testified that one fired 7.62 x 39 mm bullet and two spent 7.62 x 39 mm cartridges were found at the scene. No evidence of .25 caliber or .380 caliber ammunition was found at the crime scene. None of the witnesses testified they saw Adams with a gun.

### LEGAL AND FACTUAL SUFFICIENCY

We review a challenge to the legal sufficiency of the evidence by looking at all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App.), *cert. denied*, 546 U.S. 962 (2005). We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In reviewing the factual sufficiency of the

---

[1] The cartridges were colleted the night of the shooting from the area where witnesses testified Lighteard was standing.

evidence, we look at the evidence in a neutral light, giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We reverse only if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust or if the evidence supporting the verdict is outweighed by the great weight and preponderance of the available evidence. *Id.*

Lighteard contends the evidence is legally and factually insufficient to support the jury's verdict because the evidence fails to establish he fired the shot that killed Cardenas. He contends there is no evidence he possessed or fired a .45 caliber weapon and there is no physical evidence he ever fired any weapon. He argues the jury's finding to the contrary "depends on inferences so weak as to be . . . nothing more than speculations." We disagree.

Alvarado, Young, and Trevino each testified there were only four weapons present at the time of the shooting – Cardenas's SKS 7.62 x 39 mm rifle, Trevino's shotgun, Vargas's pistol, described as either a .25 or .380 caliber pistol, and Lighteard's pistol. Both Young and Trevino saw Lighteard fire his weapon, and according to the witnesses, Lighteard was the only person who fired towards Cardenas and the house. Spent bullets found imbedded in the house were determined to be .45 caliber, and the .45 caliber bullet recovered during the autopsy matched the bullets retrieved from the house. And the six spent .45 caliber cartridges found at the scene were found in the area witnesses testified Lighteard was standing when he fired his weapon. Although the murder weapon was not produced at trial, Young testified that a .45 caliber Hi-Point pistol in a picture produced by the State looked like the weapon Lighteard used. Finally, Trevino testified Lighteard told him Lighteard was trying to shoot Cardenas. Viewing the evidence in the light most favorable to the jury's verdict, a reasonable jury could have found the essential elements of the offense beyond a

reasonable doubt.  And, viewing the evidence in a neutral light, the evidence supporting the verdict is not so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust.  Lighteard's issues based on the sufficiency of the evidence are overruled.

## COMMENT ON DEFENDANT'S POST-ARREST SILENCE

Lighteard next argues the trial court erred by failing to grant his request for a mistrial when the State commented on his post-arrest silence.  During the State's questioning of the lead detective on the case, the following exchange occurred:

> Q.     And as far as recovering guns, you've actually never recovered the gun or nobody from [San Antonio Police Department] recovered the gun that Roderick Lighteard had that night either, did you?
>
> A.     That's correct, it was not collected.
>
> Q.     No, he called up and volunteered –
>
> [objection to leading sustained]
>
> Q.     Did Roderick Lighteard tell you where the gun was?

Lighteard objected to the question as a comment on the exercise of his right to remain silent.  The court sustained the objection.  Lighteard asked for a mistrial, which the court denied. Lighteard did not request the judge to instruct the jury to disregard the question.

Initially, the State argues Lighteard did not preserve his error because he failed to request an instruction to disregard.  The preferred sequence of events to preserve error concerning objectionable material is "(1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient."  *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).  When a party skips one part of the sequence and requests a mistrial, appellate review is limited "to the

question of whether the trial court erred in not taking the most serious action of ending the trial." *Id.* at 70. "[A]n event that could have been . . . cured by an instruction to the jury will not lead an appellate court to reverse a judgment on appeal by the party who did not request these lesser remedies in the trial court." *Id.* Accordingly, we consider whether the trial court erred in failing to grant a mistrial. *See Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (holding error was preserved although no request for instruction preceded mistrial motion).

We review the trial court's denial of a motion for mistrial for abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). When the State comments on a defendant's post-arrest silence, it violates the Fifth Amendment prohibition against self-incrimination. *Doyle v. Ohio*, 426 U.S. 610, 617-618 (1976). "A comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right." *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995). To determine whether the State commented on a defendant's exercise of his right to remain silent, we view the language from the jury's standpoint and the context in which the comment was made and decide whether the jury would necessarily and naturally take it as a comment on the defendant's exercise of his constitutional right. *See Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001) (setting out test for whether State commented on defendant's failure to testify). An instruction to disregard is presumed to cure all but the most blatant comments. *Moore v. State*, 999 S.W.2d 385, 405-06 (Tex. Crim. App. 1999); *Martinez v. State*, 276 S.W.3d 75, 78 (Tex. App.—San Antonio 2008, pet. ref'd). A mistrial is rarely warranted except in the most extreme circumstances where the prejudice is incurable. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

The question was propounded after Lighteard had vigorously cross-examined the detective about several perceived deficiencies in the investigation, including the failure to analyze the gunshot residue test conducted on the victim, a report by the first officer to respond to the scene that was lost, the failure to recover the shotgun and other pistol witnesses assert were present at the shooting, and the failure to recover any physical evidence such as spent shell casings from those weapons. In this context, the question — "Did Roderick Lighteard tell you where the gun was?" — was not of such a character that the jury would necessarily and naturally take it as a comment on Lighteard's exercise of his right to remain silent. Rather, the question dealt with scope and depth of the witness's investigation. This was reinforced when the prosecutor responded to Lighteards' objection and request for a mistrial by stating he was "simply asking if we recovered a gun from this Defendant."

The jury heard the basis of the objection and the court's agreement with the objection. The unanswered question was not so blatant that an instruction to disregard could not have cured any harm. Accordingly, the court did not abuse its discretion by denying the motion for mistrial. *See Young*, 137 S.W.3d at 72.

The judgment of the trial court is affirmed.

Steven C. Hilbig, Justice

DO NOT PUBLISH